IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Cr. No. 17-00710 SOM |
| | ) | |
| Plaintiff, | ) | ORDER GRANTING IN PART AND |
| | ) | DENYING IN PART DEFENDANT'S |
| vs. | ) | MOTION TO SUPPRESS STATEMENTS |
| | ) | |
| MATTHEW BERCKMANN, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**ORDER GRANTING IN PART AND DENYING IN
PART DEFENDANT'S MOTION TO SUPPRESS STATEMENTS**

**I.      INTRODUCTION.**

Defendant Matthew Berckmann is charged with
intentional assault with a dangerous weapon and intentional
assault by strangulation in violation of 18 U.S.C. § 113(a)(3),
(8).  ECF 4.  Alleging that statements he made to law
enforcement officers on October 18 and October 19, 2017, were
obtained in violation of his Fifth Amendment rights, Berckmann
asks this court to suppress all of those statements.  *See* ECF
31, PageID # 114; *Miranda v. Arizona*, 348 U.S. 436 (1966).  The
court grants in part and denies in part Berckmann's Motion to
Suppress.  The court suppresses certain statements Berckmann
made while he was in custody and before he was given *Miranda*
warnings.  The court does not suppress statements Berckmann
volunteered to law enforcement officers or that were otherwise

not the product of "interrogation" under *Miranda*, and statements Berckmann made after he was advised of his *Miranda* rights.

## II.       FINDINGS OF FACT.

The court received oral testimony from Park Rangers Josh Fulgium and Christine Ells at the hearing on February 23, 2018. ECF 103. Both rangers testified credibly. The court heard oral argument on March 1, 2018, has reviewed memoranda filed before and after the hearings, and has considered all exhibits in evidence, including bodycam footage and transcripts of that footage. Based on the live testimony and the documentary and video record, the court finds the following facts by a preponderance of the evidence. The findings are identified by letters of the alphabet for ease of reference in future proceedings.

A.    On the morning of October 18, 2017, Berckmann and his wife, J.F., were camping at the Hosmer Grove campground at Haleakala National Park on Maui, Hawaii. According to a nearby camper who called 911, Berckmann and J.F. got into some kind of altercation.

B.    Josh Fulgium, a National Park Service ranger, drove his Park Service vehicle to the campground to investigate. He was wearing his park ranger uniform and had a firearm.

C.    Fulgium saw Berckmann and J.F. at a picnic table about forty yards from the campground entrance, next to three

2

tents.  Shortly after Fulgium's arrival, Berckmann went into one of the tents, while J.F. remained at the picnic table.

D.  Fulgium spoke with some people near the campground entrance.  One person told Fulgium that she had heard yelling coming from the picnic table area, but did not know more.  *See* Defense Exhibit B, ECF 46-1, at 3-4 (page references are to the typed page numbers in the upper right-hand corner).[1] Another person had reportedly seen Berckmann throw J.F. to the ground and get on top of her with a knife.  *See id.* at 4.

E.  Asked by Fulgium to come over to him, J.F. walked from the picnic table to the area near the campground entrance. Fulgium then questioned J.F. intermittently over a period of about thirty minutes.  *See id.* at 5-47.  Berckmann was in the tent and out of earshot while this questioning occurred.

F.  J.F. told Fulgium that she had not been physically assaulted.  She said that she and Berckmann had gotten into only a verbal argument.  She described Berckmann as having had multiple shots of vodka that morning.  She also said that there was a filet knife at the campsite.  *See id.* at 7-10, 13-14, 18-22.

---

[1] At the hearing on February 23, 2018, this exhibit was erroneously referred to as "Defense Exhibit A-1."  *See, e.g.*, ECF 103, PageID # 902.  The exhibit list filed by Berckmann lists this exhibit as "Exhibit B."  *See* ECF 95, PageID # 841. At the hearing on March 1, 2018, the court admitted this exhibit as "Exhibit B."

G.    While Fulgium was taking to J.F., two Maui Police Department ("MPD") officers arrived at the campground.  They were in uniform and had firearms.

H.    Fulgium explained the situation to the MPD officers and discussed with them the prospect of charging Berckmann with disorderly conduct and public intoxication.  One officer said, "I think before we go down, let's make a decision – arrest this guy or not. . . . If we're going to make a decision, then let's just -- fuck, let's just go down there and arrest him."  *Id.* at 46.  Fulgium responded, "Yeah, let's just do it."  *Id.*  The MPD officer asked for clarification: "You [] are going to do the arrest for the discon?"  Fulgium responded, "Yeah, yes."  *Id.* at 46-47.

I.    Fulgium testified to this court that, notwithstanding his affirmative language, he had not, at this point, definitively decided to arrest Berckmann; he had only decided that he "was probably going to be arresting him." ECF 103, PageID # 916.  Whatever was actually in Fulgium's mind, it appears that he was at least contemplating the arrest of Berckmann in the absence of some new development.

J.    Fulgium asked J.F. to stay at the campground entrance, telling her, "[N]o matter what, you stay here, okay?" Defense Exhibit B, ECF 46-1, at 46.  He did not tell her that Berckmann might or would be arrested.  *See id.* at 45-46.

4

K.    J.F. remained behind as instructed while Fulgium and the MPD officers walked to the tent Berckmann was in.    The tent flap was partially open, and the officers could see Berckmann inside.    He appeared to be sleeping.    No weapon was visible inside the tent.    Fulgium saw at least one knife in the camping area outside the tent.    The officers decided to leave the knife where it was, but planned to avoid questioning Berckmann near it.

L.    The officers shouted Berckmann's name, told him to "wake up," and instructed him to "crawl on out" of the tent. *Id.* at 48-49.    When Berckmann began stirring, Fulgium also told Berckmann: "I need you to come out and talk to me.    It's all good, man.    Keep your hands where I can see them.    Take a step out here and talk to me, okay.    Just crawl on out.    I know you've had a lot to drink."    *Id.* at 49.

M.    While Berckmann, appearing disoriented, crawled out of the tent, Fulgium asked, "You got any guns or knives on you?"    Berckmann touched his pockets and replied, "I have nothing."    *Id.* at 50.

N.    One of the MPD officers instructed Berckmann to "sit down on your butt for us."    *Id.* at 50.    Fulgium repeated: "Just sit down on your butt, okay."    *Id.*    Berckmann complied and sat on the ground with his legs crossed.

O.   It then started to rain.  Berckmann was in blue jeans with no shirt on.  The MPD officers and Fulgium stood in a triangle around Berckmann, surrounding him, with firearms holstered.  Nobody else was in the immediate vicinity; the other campground visitors, including J.F., were roughly forty yards away.

P.   Fulgium testified that the reason the officers surrounded Berckmann was to "prevent Mr. Berckmann from getting back into a tent or getting to a weapon."  ECF 103, PageID #s 916-17.  No one said anything to Berckmann about arresting him or about whether he was free to leave.  Instead, one of the MPD officers asked Berckmann, "You know why we're here, right?"  Berckmann replied, "No."  Fulgium told Berckmann, "The reason we're here is because I got called down here that you and your wife got involved in a -- in a little verbal argument this morning.  Is that right?  You guys were arguing.  Do you remember that?"  Defense Exhibit B, ECF 46-1, at 50-51.  Berckmann denied that any argument had taken place that morning. *See id.*

Q.   Fulgium continued, "I got called over here that you, you know, might have grabbed [J.F.] and pulled her down.  Do you remember putting your hands on her at any point in time?"  Berckmann denied having put his hands on J.F.  *See id.* at 52.

Fulgium again asked Berckmann, "Never put your hands on your wife?" Berckmann again responded, "No." *Id.*

R.   Fulgium then told Berckmann, "I also was told that you were on top of [J.F.] with a knife.  Do you remember that at all?"  Berckmann replied that he and J.F. had only been "cooking with knives." *See id.* at 52.

S.   As shown on the bodycam video, Fulgium proceeded to ask Berckmann a few biographical questions, including whether Berckmann had ever been arrested.  Berckmann responded to these questions. *See id.* at 53-54.  Fulgium then asked Berckmann a final time, "You understand why we're here, though, right?  You don't have any memory of getting involved in that argument with your wife?"  Berckmann replied that there had not been "any kind of argument like that." *Id.* at 54.

T.   This initial interaction with Berckmann took less than five minutes.

U.   Fulgium asked the MPD officers to stay "with [Berckmann] for just a second" while Fulgium made a call. Fulgium stepped away and called his supervisor to explain that he wanted to arrest Berckmann for disorderly conduct and public intoxication.  He asked for approval, which he received. *See id.* at 54-55.

V.   While Fulgium was on the phone, Berckmann, still shirtless, asked the MPD officers if they could get him a shirt

from the tent.  The officers asked Berckmann for permission to
enter the tent, which Berckmann allowed.  An officer then
retrieved a long-sleeved shirt, which Berckmann put on.  *See id.*
at 55-56.

W.  After his phone conservation, Fulgium returned to
Berckmann and said:

> This is the deal.  You can't be here in the
> campground arguing loud with your wife,
> putting your hands on your wife, threatening
> your wife, okay.  You also can't be here in
> this campground drinking to the excess that
> you drink, okay.  Because I've got reason to
> believe the fact that you crawled out of the
> tent the way that you did and just the way
> your eyes look, that you're a danger to
> yourself or someone else, okay.

*Id.* at 56-57.  Berckmann interrupted Fulgium at various points
to deny that there had been an argument and that he had put his
hands on J.F.  *See id.*

X.  Fulgium then told Berckmann that he was under
arrest.  "You're going to go to jail today, okay.  You're going
to go to jail."  *Id.* at 57.  At this point, Fulgium stopped
asking Berckmann questions about the alleged incident and began
handcuffing Berckmann, who objected, repeatedly insisting that
he "didn't do anything" and that J.F. would confirm that.  *See
id.* at 57-61, 63-71, 73-79, 83, 103-04.

Y.  Berckmann challenged Fulgium to tell him what he
had done.  *See id.*  Fulgium initially responded that Berckmann

was "going to go to jail for disorderly conduct," but soon stopped responding to Berckmann's repeated challenges to the arrest except to say "okay" or "I understand." *See id.*

Z.    Fulgium put Berckmann in the back seat of the National Park Service vehicle.  The two of them drove from Hosmer Grover campground to the Maui Community Correctional Center.  The MPD officers followed behind in a separate vehicle.

AA.    During the drive, Berckmann kept saying that he was innocent and asking Fulgium why he was being arrested.  He also insulted Fulgium, threatened to sue him for wrongful arrest, and implored Fulgium to take him back to the campground. *See id.* at 106-27.  Berckmann made statements to this effect during much of the drive, but there were occasional periods-- some longer than a minute--during which neither Berckmann nor Fulgium said anything.

BB.    Fulgium generally avoided responding to Berckmann's repeated statements and questions.  Occasionally, Fulgium would say "okay," "I understand," or "you will have your day in court." *See generally id.*  A few times during the drive, Fulgium asked Berckmann if he was doing okay, if it was too hot in the back of the car, or if Berckmann needed some air. Fulgium appeared to be asking these questions for the purpose of transporting Berckmann in relative comfort.  Berckmann generally

responded by continuing to argue against his arrest. *See id.* at 106-27.

CC.   At one point Berckmann told Fulgium that was he going to "make sure I fucking hang your ass in court." Fulgium asked, "Did you say you're going to hang me?" Berckmann replied, "In court.  In court.  In court.  Did you hear that? In court." *Id.* at 112.

DD.   About halfway down Haleakala, a volcanic mountain, Berckmann managed to partly roll down his window and to unbuckle his seatbelt. He began talking about "rolling out" of the vehicle. *See id.* at 114.  Fulgium stopped the car, and the MPD officers stopped behind him.  Berckmann stuck his head out of the window.  He was agitated and told the officers, "You're arresting me for something I didn't do.  I was arrested for something I did not do." *Id.*  The officers tried to calm Berckmann down and get him to put his head back in the car. Berckmann insisted that, before complying, he wanted to talk with MPD Officer Kalama. *See id.* at 114-18.

EE.   Officer Kalama then had the following conversation with Berckmann:

> Berckmann: I'm talking to you right now.
>
> Officer Kalama: Okay.
>
> Berckmann: Listen.  Let me explain two
> things.

Officer Kalama: Let me explain it to you, okay. Based on the evidence that we have, okay, you're being arrested for disorderly conduct.

Berckmann: Okay.

Officer Kalama: So we have witnesses. . . . We don't need a statement from your wife, okay. We just need a witness saying that you're being loud and you're fighting. That's all. Your wife is not saying nothing, okay. Whatever. That's all good. But you still get arrested from these guys, okay, for disorderly conduct. . . .

Berckmann: But you know what? I shouldn't be in this fucking car, period.

Officer Kalama: Well, you're in the car because we're going from witness statements, okay.

Berckmann: Okay. . . . I don't understand what the hell this bullshit is over.

Officer Kalama: You're being arrested for disorderly conduct.

Berckmann: For something I didn't do.

Officer Kalama: All right.

Berckmann: No.

Officer Kalama: You can fight that in court.

*See id.* at 118-20.

FF. Eventually, Berckmann put his head back in the car and allowed the officers to roll the window up and buckle his seatbelt. Fulgium resumed driving Berckmann down Haleakala. A few minutes later, Berckmann once again demanded that Fulgium

11

explain why he was being arrested.  The two had the following

exchange:

> Berckmann: I'm still going to jail.  For
> what?  So I really would like to know how
> the law can wrongfully arrest people. . . .
>
> Ranger Fulgium: You understand what those
> two people told us when we got there?
>
> Berckmann: What did they tell you?
>
> Ranger Fulgium: They told us that you were
> straddling her with a knife.
>
> Berckmann: But I was not.
>
> Ranger Fulgium: We had two people tell us
> that, Matthew.
>
> Berckmann: Yeah, well, that's two people
> telling you--
>
> Ranger Fulgium: It didn't leave us a choice.
>
> Berckmann: Oh my god.  Really?
>
> Ranger Fulgium: Do you understand that?
>
> Berckmann: And . . . I had a knife on me,
> right?
>
> Ranger Fulgium: Matthew.
>
> Berckmann: Whatever.  Fuck it.  Whatever.
>
> Ranger Fulgium: Do you understand [what]
> position--
>
> Berckmann: I don't give a fuck.
>
> Ranger Fulgium: --that puts us in?
>
> Berckmann: What you did is you wrongfully
> arrested me.  If you're okay with that, you
> can live with that, go ahead.  I would tell

you if I fucking straddled her with a
fucking knife.  I wouldn't be straddling.  I
would have fucking put it in her if that was
where I was at.  Really?  Fucking -- let's
not fucking be stupid here.  Fucking
whatever.  Go ahead.  Charge me with fucking
some fucking bullshit.  Straddling her with
a knife, okay.  I ain't even got a fucking
knife in my pocket.  Are you kidding me?
Where is this so-called knife?

Ranger Fulgium:  Matthew, it's not on you.

Berckmann: No, no, no, listen.  You're
really--

Ranger Fulgium: It was back in the
campground.  We saw it.

Berckmann:  It's a bullshit charge you just
arrested me for.  I'm trying to work with
you here, and I'm telling you I got arrested
for something that didn't actually happen.
So what the fuck?  I ain't even got a
fucking knife in my pocket.

Ranger Fulgium: Matthew, what do you want me
to tell you?

Berckmann: I want you to fucking turn around
and fucking not be arresting me for
something I didn't do. . . .

*Id.* at 121-24.

GG.  Aside from this exchange, Fulgium did not discuss
the alleged incident with Berckmann during the drive from
Haleakala to the Maui Community Correctional Center.

HH.  Roughly thirty minutes into the drive, and near
the town of Pukalani, Fulgium turned off his body camera.
Fulgium testified that he did so because he "didn't know how

much more recording time there was," and because Park Ranger
Kristine Ell was going to enter the vehicle at Pukalani. ECF
103, PageID # 971. Fulgium explained that, with Ell coming into
the vehicle, he no longer felt "concerned about Mr. Berckmann
saying that there was any misconduct on my end." *Id.*

II. After Ranger Ell got into the vehicle at
Pukalani, the group finished the drive to the Maui Community
Correctional Center. At the hearing on February 23, 2018, the
rangers could not recall anything Berckmann may have said during
this period, aside from Berckmann possibly calling Ranger Ell
"sweet pea." *Id.* at PageID #s 922, 970.

JJ. Once the group arrived at the Maui Community
Correctional Center, with Berckmann still in the car, Ranger Ell
advised Berckmann for the first time of his *Miranda* rights.
Ranger Ell waited for Berckmann to acknowledge that he
understood the advisement. Instead of speaking, Berckmann
closed his eyes and leaned his head against the door of the car.
*See id.* at PageID #s 981, 993. After a brief lull, Ranger Ell
tried to get Berckmann out of the car. Berckmann did not
cooperate. As the Rangers tried to pull him out of the car,
Berckmann went limp. *See id.* at PageID # 981. Eventually,
Ranger Ell, Fulgium, and an MPD intake officer forcibly removed
Berckmann from the car. Berckmann refused to walk to the jail,
so the officers carried him there. Once out of the car,

14

Berckmann began shouting, cursing, and calling the officers names.  *See id.* at PageID #s 981-82.

KK.   Berckmann continued yelling when he was inside the jail.  Neither Ranger Ell nor Ranger Fulgium questioned Berckmann at this time.  MPD intake officers led Berckmann to an isolated holding cell where he was held overnight.  *See id.* at PageID # 982.

LL.   The next morning, October 19, 2017, Rangers Ell and Fulgium came to the Maui Community Correctional Center to accompany Berckmann to a telephonic appearance before a federal magistrate judge.  The rangers led Beckmann to a small conference room, where, before any questions were asked, Fulgium re-advised Berckmann of his *Miranda* rights by reading him a written *Miranda* waiver form.  The form stated,

> 1.   You have the right to remain silent.
> 2.   Anything you say can be used against you in a court of law.
> 3.   You have the right to talk to a lawyer for advice before I ask you any questions and to have a lawyer with you during the questioning.
> 4.   If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.
> 5.   If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time until you talk to a lawyer.

United States' Exhibit 5.  Berckmann acknowledged that he understood the waiver form, signing it around 9:35 a.m. below a

paragraph stating, "I have read this statement of my rights and I understand what my rights are." *See id.*

MM.   Fulgium read Berckmann another form, which Berckmann also signed, that waived his right to an in-person appearance before a federal magistrate judge. *See* United States' Exhibit 6.

NN.   Any interrogation on October 19, 2017, occurred after the written *Miranda* warning was given.  Berckmann's telephonic appearance was delayed until the afternoon.  During the delay, Berckmann made various statements to the rangers. Some statements were the product of express questioning, others were volunteered by Berckmann.  *See id.* at PageID #s 985-87.

OO.   Fulgium did not ask Berckmann any questions related to his case. *See id.* at PageID #s 932, 974, 1001.  Ell testified that she and Berckmann mostly engaged in "friendly banter," but that she did ask Berckmann some questions about the incident. *See id.* at PageID # 1002.  Ell recalled asking Berckmann some questions about drinking, and she asked Berckmann why a 911 call was made about him. *See id.* at PageID # 986. Berckmann responded that nothing had happened, and that he and J.F. had only had an argument. *See id.* at PageID #s 986-87.

There was no testimony about what, if anything, Berckmann said concerning drinking.[2] *See id.*

PP.  Berckmann may have made additional statements to the park rangers on October 19th, but at the hearing on February 23, 2018, the rangers could not recall the content of any such statements. *See id.* at PageID #s 931-32, 986-87.  This court stated at the hearing on March 1, 2018, that it was not deeming the United States to have waived the right to offer other post-*Miranda* statements by Berckmann.

QQ.  Berckmann appeared before the magistrate judge, then was released him from the Maui Community Correctional Center without being asked additional questions.  *See id.* at PageID # 987.

RR.  Berckmann never asked Ranger Ell or Fulgium for a lawyer; nor did he say that he did not want to be questioned by law enforcement.

SS.  Berckmann was indicted on December 14, 2017.  *See* ECF 4.

---

[2] The United States' Opposition to the Motion to Suppress contains excerpts of police reports indicating that Berckmann told Ell, "Crazy things happen when [J.F. and I] drink . . . we have to stop.  We need to get counseling . . . we're alcoholics, we have to stop."  ECF 52, PageID # 490.  No police reports, however, have been shown to the court.

## III.    CONCLUSIONS OF LAW.

### A.    Overview of the *Miranda* Safeguards.

Law enforcement personnel who wish to question individuals in their custody must first afford them certain procedural rights.  The most salient of these rights are the so-called "*Miranda* warnings": prior to questioning, an officer must tell a suspect "that he has the right to remain silent and also the right to the presence of an attorney." *Robertson v. Pichon*, 849 F.3d 1173, 1183 (9th Cir. 2017) (quoting *Edwards v. Arizona*, 451 U.S. 477, 482 (1981)), *cert. denied*, 138 S. Ct. 269 (2017). The *Miranda* warnings are designed to secure a person's Fifth Amendment privilege against compelled self-incrimination.  The Supreme Court has reasoned that the privilege is protected when a person is adequately and effectively advised of his or her rights.  *See id.; Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

The *Miranda* requirement "is violated when a suspect is placed in custody and is then interrogated without receiving *Miranda* warnings or without knowingly, intelligently, and voluntarily waiving the rights described in those warnings." *United States v. IMM*, 747 F.3d 754, 764 (9th Cir. 2014).  If *Miranda* is violated, the prosecution may not use the fruits of any interrogation in its case-in-chief.  *See Robertson*, 849 F.3d at 1183; *United States v. Cazares*, 788 F.3d 956, 980 (9th Cir.

2015).  There are, however, two important limitations embedded in the *Miranda* rule.  Both are relevant here.

First, an individual must be "in custody" for *Miranda* to apply.  *See United States v. Kim*, 292 F.3d 969, 973 (9th Cir. 2002).  The Ninth Circuit has held that an individual is in custody once a "reasonable innocent person in [the individual's] circumstances would conclude that after brief questioning he or she would not be free to leave.'"  *Cazares*, 788 F.3d at 980 (quoting *United States v. Booth*, 669 F.2d 1231, 1235 (9th Cir. 1981)); *United States v. Wauneka*, 770 F.2d 1434, 1438 (9th Cir. 1985) (same).  Before that moment, statements cannot be suppressed pursuant to *Miranda*.  *See Kim*, 292 F.3d at 973.

Second, "any statements sought to be suppressed must have been the product of interrogation."  *Robertson*, 849 F.3d at 1184.  For this reason, "volunteered statements of any kind are not barred by the Fifth Amendment."  *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980) (quoting *Miranda*, 384 U.S. at 478).  Additionally, *Miranda* only covers statements responding to "express questioning or its functional equivalent," which includes "words or actions on the part of the police that they should have known were reasonably likely to elicit an incriminating response."  *Id.; see Innis*, 446 U.S. at 299-300, 303.  "Incriminating response" is a term of art.  It means "any response--whether inculpatory or exculpatory--that the

prosecution may seek to introduce at trial." *Innis*, 446 U.S. at 301 n.5 (emphasis omitted).

Berckmann notes that it "appears to be an open question, in this circuit, which party bears the burden to prove or disprove custody and interrogation." ECF 105, PageID # 1029 (citing *United States v. Singh*, No. 2:13-CR-00084-GEB, 2017 WL 4355048, at *6 (E.D. Cal. Oct. 2, 2017)). This is not an issue requiring resolution here. Regardless of where the burden is allocated, the court's determinations on custody and interrogation would remain the same.

### B. Berckmann Was "In Custody" from the Start of His Interaction with the Officers.

As noted, only "in custody" statements are eligible for suppression. Berckmann argues that he was in custody from the beginning of his interaction with Ranger Fulgium and the MPD officers, when the officers ordered him out of the tent. *See* ECF 68, PageID #s 664-68. The United States disagrees, arguing that Berckmann was not in custody until he was told that he was "going to jail," which happened about five minutes after the initial encounter. *See* ECF 52, PageID #s 490-94. In other words, the parties have a dispute only as to the first few minutes of Berckmann's interaction with law enforcement; after that, the parties agree that Berckmann was in custody. The analysis that follows focuses on the initial minutes of the

encounter.  The court ultimately agrees with Berckmann that he
was in custody from the beginning of the encounter.

"To determine whether an individual was in custody, a
court must, after examining all of the circumstances surrounding
the interrogation, decide whether there [was] a formal arrest or
restraint on freedom of movement of the degree associated with a
formal arrest." *United States v. Bassignani*, 575 F.3d 879, 883
(9th Cir. 2009) (alteration in original) (quoting *Kim*, 292 F.3d
at 973).  When an individual is physically detained by the
police, they are not automatically "in custody" under *Miranda*;
the inquiry becomes whether the detention is "more analogous to
a so-called *Terry* stop" or a "formal arrest."  *Berkemer v.
McCarty*, 468 U.S. 420, 439, 442 (1984).

Custody analysis "is objective and is not based upon
'the subjective views of the officers or the individual being
questioned.'"  *Cazares*, 788 F.3d at 980 (quoting *Kim*, 292 F.3d
at 973).  The "inquiry requires a court to examine the totality
of the circumstances from the perspective of a reasonable
[innocent] person in the suspect's position."  *IMM*, 747 F.3d at
765 (quoting *United States v. Crawford*, 372 F.3d 1048, 1059 (9th
Cir. 2004) (en banc)); *see United States v. Galindo-Gallegos*,
244 F.3d 728, 732 (9th Cir. 2001) ("The hypothetical reasonable
man is one who is not breaking the law in so serious a way that
arrest is likely.").

Factors relevant to the custody determination include: "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual." *IMM*, 747 F.3d at 765 (quoting *Kim*, 292 F.3d at 974). These five "factors are simply ones that recur frequently"; "[o]ther factors may also be pertinent to, and even dispositive of, the ultimate determination." *Kim*, 292 F.3d at 974.

The first factor (the language used to summon Berckmann) favors a finding that he was in custody from the start of the interaction. When the officers first encountered Berckmann, they ordered him to wake up, crawl out of his tent, and sit on the ground. The language the officers used was direct and mandatory; Berckmann was not told that he was free to refuse the officers' orders. Berckmann certainly did not make "a free and voluntary choice to be questioned." *See IMM*, 747 F.3d at 765 (citing *Kim*, 292 F.3d at 974).

The second factor (the extent to which Berckmann was confronted with evidence of guilt) is best considered by distinguishing the first few minutes of the five-minute period from the later minutes of that period. At the outset of the interaction, Ranger Fulgium told Berckmann, "I know you've had a

lot to drink." Defense Exhibit B, ECF 46-1, at 49. Having too
much to drink at a national park is an arrestable offense;
indeed, it is the charge that Fulgium had in mind when he
eventually arrested Berckmann. *See* ECF 103, PageID # 945; 36
C.F.R. § 2.35(c) (prohibiting "[p]resence in a park area when
under the influence of alcohol . . . to a degree that may
endanger oneself or another person"). That being said,
Fulgium's statement and unexpressed intention, without more, is
not enough to make this factor weigh in favor of custody. A law
enforcement officer is not going to effectuate an arrest every
time he or she believes that an individual has had too much to
drink. *Cf. United States v. Estrada-Lucas*, 651 F.2d 1261, 1266
(9th Cir. 1980) (finding that the defendant was "in custody" in
part because she "was not led to believe that the [evidence the
officers had against her would be] handled as a minor
administrative matter"). It is also notable Fulgium did not
tell Berckmann that his intoxication was an arrestable offense.
*See Berkemer v. McCarty*, 468 U.S. 420, 421 (1984) (explaining
that a "policeman's unarticulated plan has no bearing on" the
custody analysis); *cf. United States v. Washington*, 387 F.3d
1060, 1064, 1069 (9th Cir. 2004) (finding that a "reasonable
person in [the suspect's] position would not have felt 'at
liberty to ignore the police presence and go about his
business'" after an officer expressly told the suspect that he

had committed "a misdemeanor, arrestable charge" (quoting *Orhorhaghe v. INS*, 38 F.3d 488 (9th Cir. 1994)).

Fulgium next told Berckmann that he was investigating a call about a "little verbal argument" between Berckmann and J.F. When Berckmann denied having argued with J.F., Ranger Fulgium simply responded, "Okay." A reasonable person confronted with a report of a verbal argument, and a statement that he had had a lot to drink, would likely have concerns but would probably not believe that he was on the verge of being arrested. *See United States v. Redlightning*, 624 F.3d 1090, 1105 (9th Cir. 2010) (observing that "the FBI agents did not present Redlightning with any evidence showing that he committed" a serious crime (murder), and explaining that this weighed against custody).

This court decides that, at the beginning of this five-minute period, the second factor weighs against custody, albeit only slightly. In arriving at this determination, the court notes that, unlike officers in other cases in which this factor weighed in favor of custody, Fulgium did not "adopt[] an aggressive, coercive, and deceptive tone," *see Bassignani*, 575 F.3d at 884, and did not "repeatedly confront" Berckmann "with fabricated evidence of guilt and engage[] in elaborate deceptions," *see IMM*, 747 F.3d at 766.

24

Later in the five-minute period, however, Fulgium did tell Berckmann that 911 callers had reported witnessing him "grab" J.F. and get "on top of her with a knife." *See* Defense Exhibit B, ECF 46-1, at 4. There is no evidence that this was fabricated or deceptive, but Fulgium was clearly confronting Berckmann with evidence indicating that he had committed an assault. At this point, this factor begins to weigh in favor of a finding that Berckmann was in custody. Drinking in a public park is one thing. But when an officer says he has evidence of a serious assault, a suspect will probably consider it highly unlikely that he will be permitted to walk away.

The third factor (the physical surroundings of the interrogation) weighs in favor of custody from the start of the interaction. This is so even though questioning took place in the middle of a public campground with other campers relatively nearby. The public nature of the location and the presence of others would often support a conclusion that Berckmann was not in custody. *See Kim*, 292 F.3d at 977 (explaining that "the fact [a defendant] is familiar with the location of the interview, considered in isolation, [can] weigh in favor of concluding that she was not 'in custody'"); *Galindo-Gallegos*, 244 F.3d at 731 ("[E]xposure to public view both reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes [a suspect's] fear that,

25

if he does not cooperate, he will be subjected to abuse"
(quoting *Berkemer* 468 U.S. at 438)); ECF 52, PageID # 492 & n.3.

The public nature of the environment is not undercut
by what Berckmann describes as the "rural" location. *See* ECF
68, PageID #s 669-71 (citing *United States v. Beraun-Panez*, 812
F.2d 578, 581-82 (9th Cir. 1987)). Being in a "rural" place is
not necessarily the same as being in an isolated or "remote"
place. The relevant inquiry is whether the questioning took
place in "public" or at "a remote location." *See United States
v. Galindo-Gallegos*, 244 F.3d 728, 732 (9th Cir. 2001)
(concluding that a "more rural stop" still took place in a
"public setting" that weighed against custody, given the
multiple "witnesses" nearby); *United States v. Beraun-Panez*, 812
F.2d 578, 582 (9th Cir. 1987) (finding a "remote" interrogation
to weigh in favor of custody because it "took place well away
from the public view"). Here, as a preliminary matter, the
public setting and the nearby campers appear to cut against
custody.

However, there are indeed other features of the
physical environment that outweigh the public circumstances.
Most notably, the officers ordered Berckmann to sit on the
ground while, still standing, they surrounded him. The
officers' positioning made it clear that Berckmann (or a
reasonable person in his shoes) could not have walked away from

the encounter, at least initially.  *See Kim*, 292 F.3d at 977-78;
*United States v. Beraun-Panez*, 812 F.2d 578, 581 (9th Cir. 1987)
(finding custody in part because Beraun-Panez "was positioned
between [] two officers beside the hood of [a] truck").  It is
also relevant that the officers instructed J.F., Berckmann's
wife, to stay away while they spoke to Berckmann.  *See Kim*, 292
F.3d at 977 (finding the defendant in custody in part because
she was "seated in isolation away from two other family members,
and then questioned").  These two features cause this court to
conclude that the third factor weighs overall in favor of
custody.  *See Beraun-Panez*, 830 F.2d at 582 (reasoning that
despite a familiar setting, "[b]y sending away [a] co-worker the
officers asserted their dominion over the interrogation site and
eliminated any last vestige of a public interrogation").

     The fourth factor (the duration of Berckmann's
detention) weighs against custody.  The officers questioned
Berckmann at the campground for five minutes.  This contrasts
starkly with the timeframe faced by the defendant in *IMM*, who
was questioned for nearly an hour, *see* 747 F.3d at 768, and the
defendant in *Kim*, who was interrogated for at least 45 minutes,
*see* 292 F.3d at 977.  In short, the first five minutes of the
interaction here constituted "a brief inquiry," not "a full-
fledged interrogation."  *See Kim*, 292 F.3d at 977; *see also,
e.g.*, *California v. Beheler*, 463 U.S. 1121, 1122, 1125 (1983)

(per curiam) (finding no custody with an interview lasting less than thirty minutes); *United States v. Hayden*, 260 F.3d 1062, 1063 (9th Cir. 2001) (concluding that a defendant was not in custody during a twenty-minute interview).

The fifth factor (the degree of pressure applied to detain Berckmann) is inconclusive. Nothing beyond what has already been discussed with respect to the preceding factors suggests that any pressure was applied by law enforcement to force Berckmann to speak with them. For example, Berckmann was not handcuffed or otherwise physically restrained during the first five minutes, and the officers did not tell him that he was going to be arrested during that period. The Ninth Circuit, however, has said that there can still be situational "pressure resulting from a combination of the surroundings and circumstances encompassed by the other factors." *IMM*, 747 F.3d at 768 (quoting *Barnes*, 713 F.3d at 1204-05). This court concludes that, while the fifth factor does not *favor* custody, it does not *disfavor* it.

With respect to the initial five minutes, the custody determination in this case is a close one. The relevant factors point in different directions. Ultimately, this court, considering the totality of the circumstances and guided by the factors articulated by the Ninth Circuit, concludes that Berckmann was "in custody" from the moment the officers first

interacted with him.  This court places particular weight on
several facts: the officers surrounded Berckmann in a triangle
formation after ordering him, in unqualified terms, to crawl out
of his tent; the officers excluded Berckmann's wife, J.F., from
the interview location; and Ranger Fulgium immediately
confronted Berckmann with evidence that, even if not at the
outset suggestive of a serious offense, would in a vacuum still
provoke concern in a reasonable person.  Moreover, evidence of a
more serious offense was presented to Berckmann just a few
moments later.  These facts in combination would cause a
reasonable person in Berckmann's shoes to believe that "after
brief questioning he  . . . would not be free to leave."  *See*
*Cazares*, 788 F.3d at 980.[3]

Of course, a finding of custody is not automatic
whenever there are *any* restrictions on an individual's freedom
of movement.  A court must ask if a detention "is more analogous
to a so-called *Terry* stop" or "a formal arrest."  *See Berkemer*,
468 U.S. at 339; *Cazares*, 788 F.3d at 980 (quoting *Booth*, 669

---

[3] Although the court concludes that Berckmann was in custody from
the beginning of the interaction, this determination does not
rely on Ranger Fulgium's first question to Berckmann (whether he
had any guns or knives on him).  *See* Defense Exhibit B, ECF 46-
1, at 50. That is not an unusual question for an officer to ask
at the outset of an interaction, and it is clear in context that
Fulgium asked it because he wanted to ensure his and others'
safety.  The question would not have altered a reasonable
person's understanding of whether he would be permitted to
leave.

F.2d at 1235); ECF 52, PageID # 492. Berckmann's detention was more like a formal arrest than a *Terry* stop.

In *Terry v. Ohio*, 392 U.S. 1 (1968), an officer suspected that two men walking to-and-fro in front of a store were plotting a robbery. The officer approached the men, "identified himself as a police officer, and asked for their names." *Id.* at 6. After the men "mumbled something," the officer "grabbed petitioner Terry, spun him around . . . and patted down the outside of his clothing." *Id.* at 7. The officer found a pistol. *See id.* Terry sought to suppress the gun as the fruit of an unlawful search. The Supreme Court did not agree. The Court explained that, even though the pat-down and detention constituted "a severe, though brief, intrusion upon cherished personal security," the officer, by acting on a reasonable suspicion that Terry was armed, had conducted a "reasonable search" under the Fourth Amendment. *Id.* at 24-25, 31.

After the decision, brief investigatory detentions came to be known as *Terry* stops. The Supreme Court, analyzing the intersection of Fourth and Fifth Amendment law, would later decide that "[w]hen there is a brief *Terry* detention, officers may, without giving *Miranda* warnings, ask [] 'a moderate number of questions to determine [a person's] identity and to try to obtain information confirming or dispelling the officer's

suspicions.'" *Berkemer*, 468 U.S. at 439-40; *see also, e.g.*, *Kim*, 292 F.3d at 976-77.

In *Berkemer v. McCarty*, the court both announced this rule and applied it in the context of a routine traffic stop involving a driver who had been weaving in and out of a highway lane. A state trooper pulled the driver over to perform a field sobriety test. *See* 468 U.S. at 423. Before administering *Miranda* warnings, the trooper asked the driver if he had been using intoxicants. *See id.* The driver responded that he had "consumed two beers and had smoked several joints of marijuana." *Id*. The Supreme Court in *Berkemer* refused to suppress the statement, holding that the driver was not in custody at the time it was uttered. *See id.* at 440. Two features of the stop drove the Court's decision. First, the detention of Berkemer was "presumptively temporary and brief" insofar as most detained motorists would have thought themselves, after law enforcement questioning, "likely [to] be allowed to continue on [their] way." *Id*. at 439. Second, the public nature of the stop would have "reduce[d] the motorist's fear that, if he d[id] not cooperate, he w[ould] be subjected to abuse." *Id.* at 437.

In this case, the two essential features from *Berkemer* are lacking. Berckmann was not subject to a familiar kind of detention, like a traffic stop, which a detainee would recognize and presume would be temporary. Instead, Berckmann was ordered

31

to wake up, crawl out of a tent, and sit on the ground in the rain while officers surrounded him. A reasonable person would be unlikely to consider this routine. Further removing this case from *Berkemer*, the exclusion of J.F. and the positioning of the officers meant that, despite the public nature of the interrogation, the officers had "asserted their dominion over the interrogation site." *See Beraun-Panez*, 830 F.2d at 582; *Kim*, 292 F.3d at 977. Berckmann's stop, in short, was unlike that in *Berkemer* and more like a formal arrest.[4]

The United States argues that Berckmann was nonetheless in a *Terry*-like detention because Fulgium was only "try[ing] to obtain information confirming or dispelling [his] suspicions," and his questions were "within the bounds of questioning permitted during a *Terry* stop." *See Berkemer*, 468 U.S. at 439-40; *United States v. Davis*, 530 F.3d 1069, 1081 (9th Cir. 2008); ECF 52, PageID # 492-93; ECF 107, PageID # 1042. The questions Fulgium asked Berckmann, however, are materially different from those in *Berkemer*, or in the Ninth Circuit's decision in *United States v. Davis*. The suspects in those cases

---

[4] The court's determination that the interaction was more like a formal arrest than a *Terry* stop is not based on any reluctance to deem the detention of an apparently sleeping person a "stop." *See United States v. Kim*, 25 F.3d 1426, 1431 (9th Cir. 1994) ("[W]here officers detain an already stationary suspect by hindering his future as opposed to ongoing progress, that they d[o] not stop the suspect as the term is commonly understood does not foreclose inquiry into whether their conduct constitutes an investigatory stop.").

were asked non-accusatory questions, such as if they "knew []
what was going on in the large shop . . . where [a] marijuana
grow was located," *Davis*, 530 F.3d at 1082 (internal quotation
marks omitted), or if they had been "using intoxicants,"
*Berkemer*, 468 U.S. at 423.  Ranger Fulgium, by contrast, did not
ask Berckmann if he had been drinking.  He *told* Berckmann that
he "knew" Berckmann had "had a lot to drink," confronted
Berckmann with eyewitness reports, and asked if Berckmann
"remembered" engaging in the alleged conduct.  *See* Defense
Exhibit B, ECF 46-1, at 49-52.

   Even if Fulgium's utterances could be characterized as
being "within the bounds" of *Terry*, *see Davis*, 530 F.3d at 1081;
ECF 107, PageID #s 1042-43, custody analysis is not a doctrine
of safe harbors.  The ultimate determination is based on "the
totality of the circumstances." *Cazares*, 788 F.3d at 980.  By
this point, the officers had isolated Berckmann from his wife;
forced him to sit on the ground; surrounded him; and confronted
him with an assertion concerning Berckmann's drunkenness which,
taken on its own, raised the specter of an arrest.  As noted, a
reasonable person facing these circumstances in combination
would not expect that, after the questioning ceased, he would be
permitted to walk away.

   The factor weighing most strongly against custody is
the short duration of the detention.  Unsurprisingly, the United

States places great emphasis on the brevity of Berckmann's interaction with the officers. *See* ECF 107, PageID # 1039 (arguing that Berckmann's detention "meets th[e] description from *Berkemer*" because "the entire interaction took less than 5 minutes" and Ranger Fulgium asked a very brief series of questions");[5] *id.* at 1043 (arguing that "the entire interaction was dramatically shorter" than that in *Davis*). But the short amount of time does not, in this case, alter what a reasonable person in Berckmann's shoes would have concluded. Thus, although, as this court has noted, the determination relating to the first five minutes involves a close call, the court concludes that Berckmann was in custody from the start. Before questioning Berckmann, the officers should have advised him of his *Miranda* rights.

Berckmann was in custody throughout the rest of the five-minute interaction; indeed, his "in custody" status grew even more apparent. As noted, the second factor (the extent to which Berckmann was confronted with evidence of guilt) initially

---

[5] To support its analogy to *Berkemer*, the United States also notes that "Ranger Fulgium had (at a minimum) reasonable suspicion that a crime had occurred within the preceding hour." ECF 107, PageID # 1039. That fact, however, has no bearing on *Miranda* custody analysis. *See Berkemer*, 468 U.S. at 442 & n.35 (explaining that custodial analysis is not affected by "the strength or content of the government's suspicions at the time [of] questioning" (quoting *Beckwith v. United States*, 425 U.S. 341, 346-47 (1976)). The United States even appears to concede as much in its Supplemental Memorandum. *See* ECF 107, PageID #s 1043-45.

weakly favored a determination that Berckmann was not in custody. But it flipped entirely in favor of custody when, later in the initial five minutes, Fulgium began confronting Berckmann with evidence of a serious assault:

> Ranger Fulgium: The big thing . . . is I'm here to make sure you're both safe, okay.
>
> Berckmann: Yeah, sure.
>
> Ranger Fulgium: I got called over here that you, you know, might have grabbed her and pulled her down. Do you remember putting your hands on her at any point in time?
>
> Berckmann: I did not put my hands --
>
> Ranger Fulgium: Never put your hands on your wife?
>
> Berckmann: No.
>
> Ranger Fulgium: Okay. I also was told that you were on top of her with a knife. Do you remember that at all?

Defense Exhibit A-1, ECF 46-1, at 52; *see United States v. Wauneka*, 770 F.2d 1434, 1439 (9th Cir. 1985) (upholding a finding of custody after police questioning "turned accusatory" and the suspect was confronted with incriminating evidence); *United States v. Walker*, CR. NO. 15-00293 SOM-KSC-2, 2017 WL 3387720, at *17 (D. Haw. Aug. 3, 2017) ("[O]nce [Walker was] asked about whether he had committed [a military crime], a reasonable person would have thought he had become a suspect who was no longer free to leave.").

There is no dispute that Berckmann remained in custody during the subsequent handcuffing by Fulgium and transportation to the Maui Community Correctional Center. Insofar as Berckmann responded to interrogation while he was in custody, his statements procured in the absence of a *Miranda* advisement must be suppressed.

## C. The Court Suppresses Certain Statements Berckmann Made While He Was in Custody and Before *Miranda* Warnings Were Given.

This court turns now to whether Berckmann's statements were made while he was being interrogated. Berckmann asks the court to suppress every statement he made while in custody on October 18th. *See* ECF 68, PageID #s 671-72.[6] In so arguing, Berckmann goes beyond what the law provides.

As noted, "volunteered statements of any kind are not barred by the Fifth Amendment." *Innis*, 446 at 300 (quoting *Miranda*, 384 U.S. at 478). Most of Berckmann's statements on October 18th amount to a lengthy, unprompted argument against Fulgium's decision to arrest him and fall within the category of

---

[6] In a Joint Submission filed on March 3, 2018, the United States explained that it was no longer seeking to introduce all of Berckmann's statements on October 18th. Specifically, the United States represented that it would not seek to introduce Berckmann's statements in Defense Exhibit B, ECF 46-1 (or any associated video) at page 53 lines 16-18; page 59 line 21 to page 62 line 20; and page 70 lines 13-14. *See* ECF 104, PageID # 1020. Berckmann acknowledged that his Motion to Suppress is now moot with respect to these statements. *See id.* This Order, by consequence, does not address whether those statements should be suppressed as having been obtained in violation of *Miranda*.

volunteered statements.  Berckmann claims that his argumentative statements "were all in response to [Fulgium's] accusations of guilt" made earlier at the campground.  ECF 68, PageID # 672.  The court is not persuaded.

It is not the case that, whenever an officer asks a question, any statement containing related content--no matter how far removed in time and context--is a "response" to that question.  Neither ordinary language nor *Miranda* functions in this extreme manner.  In any event, Fulgium never asked Berckmann to explain why he should not be arrested.  The court therefore concludes that Berckmann's decision to litigate his arrest *ad nauseum* was made "without any compelling influences" and was his own choice.  *See Innis*, 446 U.S. at 299-300 (quoting *Miranda*, 440 U.S. at 478).  To the extent that Berckmann's statements were volunteered, they are not, as a constitutional matter, suppressed.

Additionally, many of Berckmann's pre-*Miranda* statements cannot be suppressed because they did not respond to "interrogation."  Interrogation does not include "words and actions on the part of the police [that are] normally attendant to arrest and custody."  *Innis*, 446 U.S. at 301.  "[W]hen an officer . . . "informs [a suspect] of the circumstances of his arrest" or "explain[s] the . . . evidence against him," "this information may be considered normally attendant to arrest and

custody." *United States v. Moreno-Flores*, 33 F.3d 1164, 1169 (9th Cir. 1994) (quoting *United States v. Crisco*, 725 F.2d 1228, 1232 (9th Cir. 1984)); *see also id.* ("[I]nterrogation is not so broad as to capture within *Miranda*'s reach all declaratory statements by police officers concerning the nature of the charges against the suspect and the evidence relating to those charges." (alteration in original) (quoting *United States v. Payne*, 954 F.2d 199, 202 (4th Cir. 1992)).

At three different points, law enforcement officers attempted to explain to Berckmann why he was being arrested. *See* Defense Exhibit B, ECF 46-1, at 56-58, 118-20, 121-24. The officers did not provide (or expect) these explanations to prompt an incriminating response; they gave them to placate an agitated Berckmann. These utterances by the officers were of the type that normally attend arrest and custody; they did not amount to interrogation, and Berckmann's responsive statements are not suppressed on Fifth Amendment grounds. *See Moreno-Flores,* 33 F.3d at 1169-70.

Nor does interrogation encompass "innocuous questions" that an officer "could not have foreseen . . . would elicit an incriminating response." *Id.* at 1170. For this reason, the court does not suppress Berckmann's pre-*Miranda* responses to questions like whether he was being "treated fairly," "doing all right," and other innocent questions. *E.g.* Defense Exhibit B,

ECF 46-1, at 73, 82-83; *see Moreno-Flores*, 33 F.3d at 1170

(declining to suppress a response to a "question about how

Moreno-Flores' night was").

Similarly, the "routine gathering of background

biographical information, such as identity, age, and address, []

does not constitute interrogation" as long as a reasonable

officer would not think his "words or actions [are] reasonably

likely to elicit an incriminating response." *United States v.*

*Zapien*, 861 F.3d 971, 975 (9th Cir. 2017). Pursuant to this

"booking exception," the court does not suppress Berckmann's

answers to questions about his name and driver's license.

Defense Exhibit B, ECF 46-1, at 53-54; *see United States v.*

*Booth*, 669 F.2d 1231, 1238 (9th Cir. 1981) (observing that

"questions relating to Booth's identity, age and residence were

[not] at all likely to elicit an incriminating response[ and] .

. . were totally unrelated to the crime").[7]

Finally, "there is a 'public safety' exception to the

requirement that *Miranda* warnings be given." *United States v.*

*Williams*, 842 F.3d 1143, 1149 (9th Cir. 2016) (quoting *New York*

*v. Quarles*, 467 U.S. 649 (1984)). This exception covers

situations in which "there was an objectively reasonable need to

---

[7] This ruling does not address Berckmann's answer to a question
about his date of birth, which the United States is not seeking
to introduce at trial. *See* ECF 104, PageID # 1020 (exempting
Berckmann's statements at page 53 lines 16-18 of Defense Exhibit
B, ECF 46-1).

protect the police or the public from any immediate danger."
*Id.* (quoting *United States v. Carrillo*, 16 F.3d 1046, 1049 (9th
Cir. 1994)). This exception allows officers to ask "narrowly
tailored question[s that constitute] a reasonable attempt by
[the] police officer to insure his personal safety." *Carrillo*,
16 F.3d at 1050. Fulgium's pre-*Miranda* question about whether
Berckmann had a knife, which Fulgium asked at the outset of his
first encounter with Berckmann, fits comfortably within this
exception. Defense Exhibit B, ECF 46-1, at 50; *see, e.g.*,
*United States v. Carrillo*, 16 F.3d 1046, 1049 (9th Cir. 1994)
(holding that asking a defendant whether he had any drugs or
needles on his person fell within the public safety exception as
it "stemmed from an objectively reasonable need to protect [the
officer] from immediate danger" (internal quotation marks
omitted)); *United States v. Brady,* 819 F.2d 884, 885 (9th Cir.
1987) (holding that the question of whether a suspect had a gun
in his car fell within the public safety exception).[8]

The court does agree with Berckmann that his pre-
*Miranda* statements were not "*all* spontaneous, voluntary, and not
the product of interrogation." ECF 68, PageID # 671 (emphasis
added). The court finds that the following exchanges were the

---

[8] This ruling does not address Berckmann's answer to a later
question about whether he had a knife, which the United States
is not seeking to introduce at trial. *See* ECF 104, PageID
# 1020 (exempting Berckmann's statements at page 59 lines 21-25
of Defense Exhibit B, ECF 46-1).

product of custodial interrogation before *Miranda* warnings were given:

1.    The exchange involving the officers' express questioning of Berckmann about the incident while he was in custody.  The exchange runs from page 50 line 18 to page 53 line 3 of the transcript, and resumes at page 54 line 6 and ends at page 54 line 15 of Defense Exhibit B, ECF 46-1.  The officers' questions were not biographical, innocuous, or of the type normally attending arrest and custody.

2.    The exchange precipitated by Fulgium asking Berckmann if he had been arrested before.  The exchange occurs at page 53 lines 4-13 of Defense Exhibit B, ECF 46-1.  Although Fulgium's question was biographical, it was reasonably likely to elicit a response that the prosecution would seek to introduce at trail.  *See Booth*, 669 F.2d at 1238 (holding that a similar "question about prior arrests clearly sought just such a response").

3.    The exchange precipitated by Fulgium's request that Berckmann clarify whether he intended to "hang" Fulgium. The exchange begins at page 112 line 5 and ends in the middle of page 112 line 11 of Defense Exhibit B, ECF 46-1.  This question was not biographical, innocuous, or of the type that normally attends arrest and custody.

Berckmann's statements during these exchanges may not be admitted in any form in the United States' case-in-chief. Additionally, to the extent that the content of these statements can be discerned by viewing silent video footage, that footage is also suppressed. *See* ECF 105, PageID # 1032; ECFF 107, PageID #s 1045-56 (agreeing that video footage could be testimonial, but arguing that at most a "lip reader would be able to discern only a small percentage of the Defendant's [silent] answers . . . which will not convey any significant meaning").[9]

All the other statements that Berckmann made on October 18th do not, as a constitutional matter, warrant suppression. The remaining statements are either volunteered, respond to police statements or questions that normally attend arrest and custody, respond to innocuous questions, or respond to police questioning that falls within the public safety exception to *Miranda*. To the extent that video footage discloses the content of these other statements, it is not, as a constitutional matter, suppressed.

---

[9] If the parties are unable to agree on whether a particular silent video clip can be fairly described as divulging one of Berckmann's suppressed statements, they may, in advance of trial, present the particular clip to the court for its determination.

**D.    The Court Does Not Suppress Any Statements Berckmann Made After Ranger Ell Informed Him of His *Miranda* Rights.**

Berckmann also asks the court to suppress all the statements he made on October 18th and 19th after Ranger Ell advised him of his *Miranda* rights.    *See* ECF 31, PageID #s 122-23.    In support, Berckmann claims that he invoked his right to remain silent by briefly "remain[ing] silent" in the wake of Ranger Ell's advisement, and that the officers failed to "scrupulously honor" his invocation.    *See id.* at 123.

**1.    Berckmann Did Not Invoke His Right to Remain Silent.**

Nothing in the record indicates that Berckmann invoked his right to remain silent.    The Ninth Circuit has expressly held that "mere silence does not qualify as an invocation of the right to remain silent." *Sessoms v. Grounds*, 776 F.3d 615, 624 (9th Cir. 2015) (en banc).    Instead, an invocation must be "unequivocal and unambiguous." *Jones v. Harrington*, 829 F.3d 1128, 1137 (9th Cir. 2016).

In this case, the evidence indicates that Berckmann remained silent only for a brief period after being advised of his *Miranda* rights.    This is not an invocation of the right to remain silent.    Accordingly, Berckmann's statements are not suppressed because based on his argument that the park rangers failed to "scrupulously honor" such an invocation.

Berckmann's citation to *Jones v. Harrington*, 829 F.3d 1128, does not alter the analysis.  Berckmann argues that, under *Jones*, "a suspect's silence may suffice--if the surrounding circumstances establish that it is unequivocal and unambiguous-- to indicate that the suspect 'does not wish to be interrogated.'"  ECF 68, PageID # 676 (quoting *Jones*, 829 F.3d at 1137).  At the hearing on March 1, 2018, Berckmann insisted that his silence was "uncharacteristic," and therefore an "unequivocal invocation," because he had talked incessantly up until the moment that Ranger Ell read him his *Miranda* rights. This argument fails for three reasons.

First, it is inconsistent with the record.  The bodycam footage depicts numerous lapses or "lulls" during which Berckmann remained silent for some period of time, all prior to Ranger Ell's *Miranda* advisement.  Even during the hearing at which parts of the footage was played there were periods of silent driving.  It is a stretch to say that Berckmann's silence at the Maui Community Correctional Center was "uncharacteristic."

Second, *Jones v. Harrington* does not support Berckmann's claimed exception to the Ninth Circuit's holding in *Sessoms* that "mere silence does not qualify as an invocation of the right to remain silent."  776 F.3d at 624.  *Jones*, on its facts, did not deal with silence; it involved a suspect's

44

*statement* that he "did not want to talk no more." 829 F.3d at 1137.

Third, even if a suspect somehow could, through silence, make it "sufficiently clear[ to] a reasonable police officer" that he did not want to talk, *id.* at 1138, Berckmann's silence failed to do so as different plausible interpretations of that silence abound. As Berckmann conceded in his reply memorandum, by going silent and limp he "force[d]" the officers "to pull him out of the car and carry him into the jail." ECF 68, PageID # 675. A plausible interpretation of Berckmann's conduct--even assuming, contrary to the record, that his silence was "uncharacteristic"--is that he was trying to "play dead" and resist transportation into the jail. It is notable that once the officers successfully dragged Berckmann out of the car, he broke his silence and began to yell. *See* ECF 103, PageID #s 981-82. Under these circumstances, it cannot be said that Berckmann, by briefly remaining silent, unambiguously invoked his Fifth Amendment right to remain silent.

### 2. The Officers Did Not Deliberately Employ a Two-Step Interrogation Technique.

In the alternative, Berckmann argues that his post-*Miranda* statements should still be suppressed because any waiver of his *Miranda* rights was invalidly obtained under the rule

announced in *Missouri v. Seibert*, 542 U.S. 600 (2004).  *See* ECF
31, PageID # 123.  This argument fails.

The *Seibert* rule, as the Ninth Circuit has explained,
requires "a trial court [to] suppress postwarning statements
obtained" when law enforcement officers use a two-step
interrogation technique: ask a suspect "questions until he
confesse[s]; then, immediately after his [] confession, [] read
him his *Miranda* rights and ask him to [repeat] what he ha[s]
previously [said]."  *United States v. Williams*, 435 F.3d 1148,
1150 (9th Cir. 2006) (discussing *Siebert*, 542 U.S. 600).
Exclusion under *Seibert* is limited "to those cases involving
deliberate use of th[is] two-step procedure."  *Id.* at 1557; *see
also Seibert*, 542 U.S. at 604 (plurality opinion) (concluding
that "a statement repeated after a warning in [] circumstances"
involving the two-step procedure "is inadmissible"); *id.* at 622
(Kennedy, J. concurring in the judgment) (providing the fifth
vote and explaining that the *Seibert* rule is inapplicable
"unless the deliberate two-step strategy [is] employed").  Thus,
to determine whether *Seibert* supports exclusion, a court "should
consider whether objective evidence and any available subjective
evidence, such as an officer's testimony, support an inference
that the two-step interrogation procedure was used to undermine
the *Miranda* warning."  *Williams*, 435 F.3d at 1158.

In this case, there is no evidence that the rangers deliberately employed a two-step interrogation technique. The pre-warning questioning of Berckmann was brief. The only substantive question asked of Berckmann was whether he recalled putting his hands on J.F. or getting on top of her with a knife. Far from seeming deliberate, this pre-warning interrogation was likely a circumstance in which Ranger Fulgium "may not [have] realize[d] that [the] suspect [was] in custody." *See Seibert*, 542 U.S. at 620-21 (Kennedy, J. concurring in judgment); *see also id.* at 615-17 (plurality opinion) (discussing factors weighing against finding deliberateness).

Further, unlike the defendant in *Seibert*, Berckmann did not "confess" to anything; he denied that any assault or argument had taken place. The multi-stage interrogation of Berckmann, consequently, looks nothing like the two-step technique. *See Seibert*, 542 U.S. at 613, 616-17 (plurality opinion) (explaining that the assumption underling the two-step interrogation technique "is that *with one confession in hand before the warnings*, the interrogator can count on getting its duplicate" (emphasis added)); *id.* at 621 (Kennedy, J. concurring in judgment) ("The strategy is based on the assumption that *Miranda* warnings will tend to mean less when recited midinterrogation, *after inculpatory statements have already been obtained*." (emphasis added)); *see also Williams*, 435 F.3d at

1154 ("As the facts in *Seibert* make clear, '[t]he object of
[the] question-first [tactic] is to render *Miranda* warnings
ineffective by waiting for a particularly opportune time to give
them, *after the suspect has already confessed*." (emphasis added)
(alterations in original) (quoting *Seibert*, 542 U.S. at 611)
(plurality opinion)).

There is, moreover, no evidence that either Ranger
Fulgium or Ranger Ell confronted Berckmann with his pre-warning
statements as an inducement to talk after *Miranda* warnings were
given. *See Seibert*, 542 U.S. at 620-21 (Kennedy, J. concurring
in judgment) (explaining a highly relevant circumstance is
whether the "postwarning interview resembled a cross-
examination" in that "the interrogating officer [] relied on the
defendant's prewarning statement to obtain the postwarning
statement"); *id.* at 615-17 (plurality opinion) (describing the
factors weighing against suppression).

Berckmann insists that *Seibert* should nonetheless
apply "given the continuity of custody and of the interrogating
rangers." ECF 31, PageID # 123. The court disagrees. Those
facts alone do not establish that the officers used the two-step
technique described in *Seibert* and *Williams*, or that the
officers attempted "deliberately to undermine and obscure the
[subsequent *Miranda*] warning's meaning and effect." *See
Williams*, 435 F.3d at 1160. There is simply no evidence to

48

support Berckmann's contention that his statements are suppressible under *Seibert*.

Because *Seibert* does not apply, Berckmann's post-*Miranda* statements are admissible as long as they are voluntary. *See Williams*, 435 F.3d at 1153 (explaining that if *Siebert* is inapplicable, then "if the prewarning statement was voluntary . . . the postwarning confession is admissible unless it was involuntarily made"). On the record before it, the court concludes that the United States has satisfied its burden to prove that Berckmann's statements were voluntary. *See Dickerson v. United States*, 530 U.S. 428, 433-34 (2000); *Williams*, 435 F.3d at 1153 n.5 (9th Cir. 2006). There is nothing to suggest that Berckmann's will was overborne or that his statements were the product of undue coercion, and Berckmann makes no argument to the contrary.

The record demonstrates that Berckmann knowingly, intelligently, and validly waived his Fifth Amendment rights, first by speaking after Ranger Ell advised him of his rights on October 18th, and again by signing a waiver form on October 19th. There is, therefore, no constitutional reason to suppress any of Berckmann's post-warning statements on either date.

IV.     **CONCLUSION.**

The court GRANTS IN PART and DENIES IN PART Berckmann's Motion to Suppress. The court suppresses certain

statements identified earlier in this order that Berckmann made while in custody and prior to Ranger Ell's advisement of his *Miranda* rights.  The Motion to Suppress is denied in all other respects.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, March 28, 2018.



/s/ Susan Oki Mollway

Susan Oki Mollway

United States District Judge

United States v. Berckmann, Cr. No. 17-00710 SOM; ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO SUPPRESS STATEMENTS.